CPC INTERNATIONAL, INC.

v.

NORTHBROOK EXCESS & SURPLUS INSURANCE CO.

No. 95–36–Appeal.

Supreme Court of Rhode Island.

Dec. 26, 1995.

Richard Galli, Jerome Facher, David Harris, for Plaintiff.

Kenneth P. Borden, Stephen Miller, Patrick Landers, for Defendant.

## OPINION

WEISBERGER, Chief Justice.

This case comes to us as a certified question from the United States Court of Appeals for the First Circuit pursuant to Rule 6 of the Supreme Court Rules of Appellate Procedure.[1] The certified question reads as follows:

> "What trigger-of-coverage standard would the Rhode Island Supreme Court use for determining at what point an 'occurrence' causing 'property damage' took place, within the meaning of the insurance policy provisions provided in the separate opinion in this case, where an insured alleges that a spill of hazardous contaminants in 1974 migrated through the groundwater, causing immediate injury to the pertinent property, which was not, in fact, discovered, however, until at least 1979?"

The facts as relevant to the certified question are as follows. The defendant, Northbrook Excess & Surplus Insurance Co. (Northbrook) provided a $25 million excess-liability policy to plaintiff, CPC International, Inc. (CPC), a New Jersey packaging and manufacturing corporation. The policy was in effect from July 1, 1979, to July 1, 1980. CPC's former subsidiary, Peterson/Puritan, an aerosol-packaging plant located in Cum-

---

1. Rule 6 of the Supreme Court Rules of Appellate Procedure provides that this court may answer questions of law certified to it by a Court of Appeals of the United States "when requested by the certifying court if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of this court."

berland, Rhode Island, was allegedly responsible for land and water contamination for which the EPA required an environmental cleanup. CPC now seeks indemnity for the costs of the cleanup from Northbrook.

Peterson/Puritan, a manufacturer of flea spray, hair spray, spot remover, and oven cleaner, among other products, became a subsidiary of CPC in 1968. The Peterson/Puritan plant was bounded on its western edge by the Blackstone River. On June 21, 1974, there was a massive spill of more than 6,200 gallons of perchloroethylene (perc) onto the soil at the Peterson/Puritan plant following an accidental rupture of a storage tank. At that time, CPC claims that there was no indication of any damage to the Quinnville well fields that feed the municipal water supply of the towns of Cumberland and Lincoln. In October 1979, both towns discovered that their municipal water supply was contaminated by chemicals. Later that year, the Quinnville wells were closed. In 1982, the town of Lincoln and the Board of Water Commissioners of Lincoln sued Peterson/Puritan for the contamination of the wells. The suit was settled in 1984 for $780,000, paid by CPC's primary insurer, Northwestern National Insurance Company (Northwestern). The Northwestern policy had a coverage limit of $1 million.

In 1983 the EPA investigated an area it designated OU–1, which included the Peterson/Puritan site and the aquifer east of the Blackstone River. In 1987 the EPA identified Peterson/Puritan as the party responsible for the chemical contamination of the ground water and ordered it to do a further analysis of the site and to investigate additional responsible parties. Later that year, Northwestern informed CPC and Northbrook that primary coverage under its policy was exhausted. Northbrook subsequently refused to provide excess coverage for costs incurred in the well closure and cleanup of the area.

In July of 1987, CPC filed suit against Northbrook in New Jersey State Court for a declaration that Northbrook must indemnify it for cleanup costs and other damages arising from the town of Lincoln settlement and the EPA order in respect to the aquifer east of the Blackstone River. The case was removed on the basis of diversity jurisdiction to the United States District Court for the District of New Jersey. In 1989 the case was transferred to the United States District Court for the District of Rhode Island where it was tried, and judgment as a matter of law was entered in favor of Northbrook.

An examination of the record before the District Court would justify a trier of fact in finding the following chronological events. Between 1963 and the late 1970s, Peterson/Puritan employees routinely dumped chemicals, including volatile organic compounds (VOCs), into the drains and septic systems of the Peterson/Puritan plant. The contamination of the wells was discovered by state investigators from the Rhode Island Department of Health in October 1979 during the Northbrook policy period. Following the discovery of the contamination, the wells were determined to be unusable and were closed.

CPC's theory of the case at trial was that prior to the perc spill, the VOCs and other chemicals already in the soil had been trapped there by silt and clay, where they would have remained indefinitely. The perc spill, however, picked up the trapped chemicals as it flowed underground to the Quinnville wells, which it reached in 1979. CPC argued that discovery of the well-field contamination in October 1979 triggered coverage under the Northbrook policy. Northbrook's theory at trial was that the contamination of the well fields was caused by Peterson/Puritan's continuous dumping of chemicals at the plant and not by the perc spill. Northbrook argued in the alternative that even if the perc spill had caused the contamination, the spill either polluted the ground water in 1974 or reached the well fields after the 1979–80 policy period, and thus that coverage under the policy was never triggered.

The District Court granted Northbrook's motion for judgment as a matter of law, holding that under "general principles of insurance law," the appropriate trigger of coverage was the point at which the aquifer was actually damaged. The court determined that the damage took place at either the time of the perc spill in 1974 or at the time the

perc-led plume of chemicals reached the well field and that neither could have taken place during the policy period. CPC appealed the decision to the First Circuit Court of Appeals.

The Court of Appeals attempted to resolve the trigger-of-coverage issue under Rhode Island law, which it noted is determinative of the appeal, but concluded that Rhode Island case law is unclear on the issue. We agree that no prior opinion of this court provides any guidance in answering the certified question. Under one theory, enunciated by the Rhode Island District Court, coverage is triggered when the insured "knew, or reasonably should have known [of the property damage]." *Bartholomew v. Insurance Co. of North America,* 502 F.Supp. 246, 254 (D.R.I. 1980), *aff'd,* 655 F.2d 27 (1st Cir.1981). Under another possible theory, coverage may be triggered when an injury-causing event happens during the policy period. The court suggested that the latter theory could be applied to impose coverage under the facts as found in the District Court in the instant case following any one of three subtheories: (1) "wrongful act" theory, under which the 1974 perc spill would have been the trigger; (2) "injury-in-fact" theory, in which the triggering injury would have occurred within days of the 1974 perc spill, or (3) "exposure" theory, under which the triggering injury occurred within minutes of the spill.

■ The question certified by the First Circuit asks us to determine, under Rhode Island law, when there has been an "occurrence" sufficient to trigger coverage under a general liability policy when the insured sustains a chemical spill that results in a property loss that is not discovered until years after the spill took place. We answer that an "occurrence" under a general liability policy takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence, is discoverable.

Northbrook agreed to indemnify CPC for damages flowing from personal injuries, property damage, or advertising liability "caused by or arising out of each Occurrence happening anywhere in the world." "Property damage" is defined in the policy as follows:

"[L]oss of or direct damage to or destruction of tangible property (other than property owned by any insured) and which results in an Occurrence during the policy period."

"Occurrence" is defined in the policy as follows:

"[A]n accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury, Property Damage or Advertising Liability neither expected nor intended from the standpoint of the Insured."

\* \* \* \* \* \*

"All such Personal Injury, Property Damage or Advertising Injury caused by one event or by continuous or repeated exposure to substantially the same conditions shall be deemed to result from one Occurrence."

Read together, the provisions of the Northbrook policy provide coverage to an insured that sustains an occurrence—that is, an event that results in compensable property damage during the policy period. In other words, there can be no occurrence under the policy without property damage that becomes apparent during the policy period, and property loss and compensable damages cannot be assessed unless the property damage is discovered or manifests itself. "Property damage" and "occurrence" are thus inextricably intertwined.

We are persuaded by two recent First Circuit Court of Appeals cases. The first resolved the rights and liabilities of various insurers of an asbestos-products manufacturer under a general liability policy similar to the Northbrook policy. *Eagle–Picher Industries, Inc. v. Liberty Mutual Insurance Co.,* 682 F.2d 12 (1st Cir.1982). The terms of the policy in *Eagle–Picher* defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results, during the policy period, in bodily injury." *Id.* at 17. The Court of Appeals characterized the asbestos-related injury claim before it as a "latent injury" case, reasoning that only in a few such cases would a plaintiff be both exposed to asbestos and injured by it during a one-year policy period. *Id.* at 24. The court then construed "occurrence" under

the policy to mean "no more than that [the] injury must result during the policy period." *Id.* The court went on to frame the policy provisions as supporting a "manifestation" trigger-of-coverage theory, defining "manifestation" to require "clinically evident, diagnosable disease." *Id.*

The other Court of Appeals case involved a claim under an occurrence policy for damages incurred when defective windows fell out of a building during a series of winter storms. *American Home Assurance Co. v. Libbey–Owens–Ford Co.,* 786 F.2d 22 (1st Cir.1986). In that case, the court ruled that a covered occurrence takes place when "a reasonable person would be aware that a defect exists that may give rise to a cause of action." *Id.* at 30. In that case, the court determined that the insured building owner incurred covered damages under the policy when the architect informed the owner that the falling windows posed a "clear and present danger to the public" and could not be used. *Id.*

Northbrook's reliance on a footnote in *Textron, Inc. v. Liberty Mutual Insurance Co.,* 639 A.2d 1358 (R.I.1994), for the proposition that an occurrence took place at the time the initial spill was observed is misplaced. Our discussion of occurrence policies in a footnote in that case was intended only to clarify the distinction between an occurrence policy and a claims-made policy. *See id.* at 1361. That distinction is in no way determinative of the issues raised by this certified question. We did not, in that case, purport to define or to determine when such an occurrence would take place since no such issue was before us.

 From our analysis of applicable case law, we conclude that coverage under a general liability policy is triggered by an occurrence that takes place when property damage, which includes property loss, manifests itself or is discovered or in the exercise of reasonable diligence is discoverable.

LEDERBERG, J. was unable to be present at oral argument but participated on the basis of the briefs.