United States Court of Appeals
For the First Circuit


Nos. 97-2073
97-2074

CPC INTERNATIONAL, INC.,

Plaintiff, Appellee,

v.

NORTHBROOK EXCESS AND SURPLUS
INSURANCE COMPANY,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Francis J. Boyle, Senior U.S. District Judge]



Before

Torruella, Chief Judge,

Lynch, Circuit Judge,

and Stearns, District Judge.



Michael Aylward, with whom Alice Olsen Mann, Morrison, Mahoney
& Miller, Daniel A. Bartoldus, James J. Jennings, Joshua N.
Krellen, and Rivkin, Radler & Kremer were on brief, for appellant.

David L. Harris, with whom Geoffrey A. Price, Lowenstein,
Sandler, Kohl, Fisher & Boylan, P.C., Mark O. Denehy, and Adler,
Pollock & Sheehan, Inc. were on brief, for appellee.

Laura A. Foggan, Daniel E. Troy, Andrew D. Tabachnik, andWiley, Rein & Fielding on brief for amicus curiae Insurance
Environmental Litigation Association.


June 1, 1998

LYNCH, Circuit Judge. An accident in 1974 involving a
railroad tank car and a chemical storage tank has led to years of
environmental litigation and, ultimately, to this court's
consideration of those events almost a quarter century later. In
June 1974, an engineer of the Providence and Worcester Railroad
Company moved a group of railroad tank cars while one car was still
attached to a chemical storage tank at a manufacturing facility in
Cumberland, Rhode Island. The facility is located on the banks of
the Blackstone River. A hole was torn in the bottom of the tank
and the contents, over 6,200 gallons of perchlorethylene ("perc"),
gushed out, boring a four-foot hole in the ground. The fire
department responded to an emergency call and hosed down the area
of the spill. No further action was taken, and so matters rested
until 1979.
In October 1979, the Rhode Island Department of Public
Health tested drinking water wells across the Blackstone River, in
the nearby town of Lincoln, for environmental pollution. The
state's decision to test in this manner was an advanced one for the
times. Those tests and subsequent tests showed that the wellfields
and the aquifer from which they drew water were contaminated with
a variety of volatile organic chemicals ("VOC's"), including perc,
1,1-dichlorethane, 1,1-dichloroethylene, 1,2-transdichloroethylene,
1,1,1-trichloroethane, trichloroethylene, and
trichlorofluoromethane. The wells, which supplied water to
Cumberland and Lincoln, were immediately closed. Subsequent
investigation by the United States Environmental Protection Agency
("EPA") pointed to an area across the Blackstone River and east of
the wells as the likely source of the aquifer's contamination. 
That area was occupied by the Peterson/Puritan manufacturing
facility, which produced and packaged various household and
personal care products. Peterson/Puritan is a subsidiary of the
plaintiff CPC International, Inc., now known as Bestfoods. This
facility is where the tank car accident happened in 1974.
This suit demonstrates the immense cost, complexity and
duration of environmental insurance litigation. In 1987, CPC sued
its excess carrier, Northbrook Excess and Surplus Liability
Company, for indemnification of costs incurred during the EPA
ordered clean-up of pollution at Peterson/Puritan. This is the
third appeal to this court. Judgments have twice been vacated,
this court has certified a question to the Rhode Island Supreme
Court, the Rhode Island Supreme Court has issued an opinion which
clarified Rhode Island "trigger of coverage" law, and the case has
been twice tried to juries. We discuss that history later. In
1997, a jury awarded CPC $12,632,885.94 in damages plus over $5
million in pre-judgment interest. That award is the subject of
this appeal.
As is common in these cases, the jury had two main issues
to decide. The first was whether an "occurrence" causing property
damage took place between July 1, 1979, and July 1, 1980, which was
the policy period during which Northbrook provided coverage. The
second was to determine whether the property damage resulted from
company activities that were excluded from coverage by the policy's
standard "pollution exclusion" provision or whether the relevant
occurrences fit within the also standard "sudden and accidental"
exception to that exclusion (and was thus covered). As evidenced
by the verdict, the jury decided both issues in favor of CPC. 
Northbrook attacks the verdict on both fronts. First,
Northbrook says the evidence compels the conclusion that there was
no occurrence during the policy period. Northbrook says that the
"property damage" at issue in the case is strictly in the area
immediately surrounding the Peterson/Puritan manufacturing
facility, and that CPC either knew or should have known of this
property damage prior to the policy period. Therefore, there was
no "occurrence" (as that term is defined in Rhode Island law)
during the policy period and no coverage is available. 
Northbrook buttresses this challenge by saying it was
unfairly hampered in its presentation of its case (that CPC knew or
should have known of the property damage) when the trial court
excluded evidence about environmental events before 1979 elsewhere
in the CPC corporate family. Northbrook says that the proposed
evidence, two prior judicial decisions in which CPC was a party,
contained fact-findings relevant to the state of CPC's internal
knowledge and the state-of-knowledge in the industry about
groundwater pollution. Northbrook's says that the evidence
demonstrates that CPC's regular waste-disposal practices and the
1974 perc spill should have put CPC on notice of property damage
long before 1979, and thus there is no coverage during the insuring
period. 
Second, Northbrook challenges the jury's conclusion that
the property damage was caused by a "sudden and accidental"
discharge. Northbrook concedes the 1974 perc spill was sudden and
accidental, but argues that the evidence compels a conclusion that
it was Peterson/Puritan's routine waste-disposal and polluting
practices, not the 1974 perc spill, which caused the pollution
around the Peterson/Puritan site. Northbrook points out that the
comprehensive general liability policy at issue here contains a
standard pollution exclusion for the discharge of chemicals, and
the only exception to that exclusion is for "sudden and accidental"
events. Thus, Northbrook says, even if there were an occurrence
during the policy period, Northbrook is still not liable because
the clean-up costs were driven by CPC's routine polluting
activities, not the spill.
Now, twenty-five years after the tank rupture, almost
twenty years after the discovery that the wells were contaminated
and eleven years after the suit was instituted, we affirm the jury
award. While the evidence did not necessarily require the jury's
conclusions, it certainly permitted them. We do not reach the
cross-appeal. 
I
Background Facts 
We set the stage for the parties' arguments with a
general outline of the actions and findings of the involved
governmental environmental agencies as to the two wellfields and
the Peterson/Puritan site. Much of this is undisputed. The
appropriate inferences to be drawn from certain environmental
findings are, of course, disputed, and were argued to the jury.
In October 1979, the Rhode Island Department of Health,
Division of Water Supply, using testing procedures advanced for the
times, tested the municipal water supplies of the Town of
Cumberland and the neighboring Town of Lincoln and discovered VOC
contamination. The Quinnville Wellfield, supplying Cumberland, is
located on the west side of the Blackstone River, across the river
and approximately three fifths of a mile from the Peterson/Puritan
manufacturing facility. The Lenox Street Well, supplying Lincoln,
is located on the same side of the river as Peterson/Puritan, over
a mile away. Both wells were closed immediately after the
contamination was discovered.
In 1980, the EPA hired environmental engineers Goldberg-
Zoino and Associates ("GZA") to conduct a hydrogeologic study of
portions of the aquifer underlying and around the Blackstone River
in order to establish the source and extent of the groundwater
pollution contaminating the wells. In 1982, GZA reported its
conclusion that the most probable source of the contamination of
the Quinnville Wellfield was the Peterson/Puritan plant. GZA
relied principally on three critical findings: (1) the highest
levels of VOC groundwater contamination were observed in the
industrial area where Peterson/Puritan was located; (2) the VOC's
found in the Quinnville Wellfield were the same as those found in
the groundwater in the industrial area; and (3) Peterson/Puritan
was the only operation in the area known to use and store the VOC's
found in the water supply. 
According to GZA's report, the Blackstone River typically
acts as a groundwater flow boundary, meaning that groundwater on
the east side of the river is generally unable to cross over to the
west side. When the wells are pumping, however, the river is not
an effective barrier and groundwater is drawn into the wellfield.
During sustained pumping of the Lincoln
wellfield, . . . a portion of the flow crosses
the Blackstone from the Cumberland side of the
river. Flow enters the wellfield via both
induced infiltration from the river and direct
groundwater flow beneath the river from the
northeast corner of the site.
In addition, the levels of the contaminant concentration in the
wellfield are directly related to the intensity of the pumping.
When the wells are turned off and the flow
field reverts to its natural state, as
described above, contaminant levels decrease
significantly. When the wells are turned on
again, contaminant concentrations increase
with pumping duration to their previous
levels. This indicates that contaminant flow
is being induced via pumping from outside of
the normal recharge area for the wellfield,
i.e. the Cumberland side of the Blackstone
River [where Peterson/Puritan is located].

GZA concluded that the pumping of the wells drew contaminants
from the area immediately surrounding the Peterson/Puritan plant
under and across the river into the wellfield. Based on this
analysis, Peterson/Puritan became the EPA's primary focus.
Following this report, Peterson/Puritan hired Malcolm
Pirnie, Inc., another environmental engineering firm, to further
analyze the VOC groundwater contamination of the wellfield. 
Malcolm Pirnie's report, issued in June 1983, supported GZA's
conclusion. "Peterson/Puritan is responsible for the release of
VOC's to the aquifer sufficient to have contributed to the past
contamination of the Quinnville Wellfield . . . ." In addition,
"the sustained pumping from the wellfields could draw contaminated
groundwater from the east to the west side of the Blackstone River
where it could be drawn into the wells." The report stated that
the wellfield was no longer contaminated, but that contamination
would be renewed by the recommencement of pumping within the
wellfield without prior interception of the contaminant plume.
In 1983, the EPA designated an area including both the
Peterson/Puritan site and the aquifer east of the Blackstone River
as "OU-1," and placed the site on its National Priorities List. In
1987, following several years of negotiations with
Peterson/Puritan, the EPA issued an Administrative Order by
Consent, pursuant to the Comprehensive Environmental Response
Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601-9675. 
That Order identified Peterson/Puritan as the party responsible for
the release of the hazardous substances migrating into the
groundwater at OU-1. 
As required by the Order, Peterson/Puritan undertook a
Remedial Investigation/Feasibility Study ("RI/FS") to investigate
additional responsible parties and further analyze site conditions. 
This report was prepared by ABB Environmental Services and issued
in 1993. ABB, like Malcolm Pirnie, largely confirmed GZA's finding
that Peterson/Puritan was the principal source of VOC contamination
in the aquifer and the Quinnville Wellfield.
The EPA issued its Record of Decision ("ROD") for the OU-
1 site in June 1993. The ROD stated that the Quinnville Wellfield
"was a drinking water source in 1979, when it was closed due to OU-
1 contamination. Prior to its closure, the wellfield provided
water that did not pose any health threats." The ROD further
stated that the 1974 perc spill, along with historical releases
into manholes and catch basins, was the primary source of
contamination of the Quinnville Wellfield. The ROD concluded that
the wells could be reopened when the contamination was remediated,
and ordered CPC to clean up the OU-1 area as a prerequisite for the
reopening of the wells. Finally, because the wellfield was "a
receptor of OU-1 contamination," and "the potential future use of
the wellfield as a drinking water source is a realistic
possibility," the December 13, 1995, Consent Order between CPC and
the EPA extended OU-1 to include the Quinnville Wellfield.
II
Insurance Coverage and Terms
A. Primary Coverage and Town of Lincoln Suit
In October 1982, based on GZA's report, the Town of
Lincoln filed suit against Peterson/Puritan for damages resulting
from the contamination of its water supply. In June 1984, the suit
was settled when Peterson/Puritan agreed to pay the Town of Lincoln
$780,000 and install and maintain engineering controls in exchange
for the Town's release of all potential claims. The settlement was
paid by Northwestern National Insurance Company, CPC's primary
insurance carrier, under a policy with a coverage limit of $1
million. On April 10, 1987, Northwestern National informed CPC and
Northbrook that the primary insurance policy was exhausted, thus
bringing Northbrook into the arena.
B. The CPC-Northbrook Insurance Policy
From July 1, 1979, to July 1, 1980, CPC was insured by
Northbrook under an umbrella liability policy. This policy, with
a limit of $25 million, was CPC's first layer excess policy, hence
the next coverage in line after Northwestern National's $1 million
primary policy was exhausted. The Northbrook policy insured CPC
worldwide, including CPC's subsidiaries and all other entities
financially controlled by CPC. 
Under Section 1, "Coverage," the policy stated:
The Company hereby agrees, subject to the
limitations, terms and conditions hereinafter
mentioned, to indemnify the Insured for all
sums which the Insured shall be obligated to
pay by reason of the liability
A. imposed upon the Insured by law, or
B. assumed under contract or agreement
by the Named Insured,
for damages on account of 
A. Personal Injuries
B. Property Damage
C. Advertising Liability,
caused by or arising out of each Occurrence
happening anywhere in the world. 

The Definitions section contained the following definitions:
"Property Damage" shall mean loss of or
direct damage to or destruction of tangible
property (other than property owned by any
Insured) and which results in an Occurrence
during the policy period. . . . 

"Occurrence" means an accident, event or
happening including continuous or repeated
exposure to conditions which results, during
the policy period, in Personal Injury,
Property Damage or Advertising Liability
neither expected nor intended from the
standpoint of the Insured. . . .

The Exclusions section provided:
This policy shall not apply to Personal Injury
or Property Damage arising out of the
discharge, dispersal, release or escape of
smoke, vapors, soot, fumes, acids, alkalis,
toxic chemicals, liquids or gases, waste
materials or other irritants, contaminants or
pollutants into or upon land, the atmosphere
or any water course or body of water; but this
exclusion does not apply if such discharge,
dispersal, release or escape is sudden and
accidental.

In a "reservation-of-rights" letter dated April 27, 1987,
Northbrook advised CPC that it had no obligation to indemnify CPC
for claims arising from the Town of Lincoln action or the EPA-
ordered cleanup. The letter was based, inter alia, on the 
pollution exclusion and on the date of occurrence.
III
This Litigation
A. Commencement of Suit and Initial Application of New Jersey Law
On July 21, 1987, CPC filed suit against Northbrook in
New Jersey Superior Court. CPC alleged that all of the conditions
precedent to insurance coverage had been satisfied or waived, and
sought a declaration that Northbrook was obligated to indemnify CPC
for Peterson/Puritan's "entire ultimate net loss" in excess of
Northwestern National's $1 million coverage limit. CPC also sought
a judgment estopping Northbrook from further denying coverage. 
Northbrook removed the action to the U.S. District Court
for the District of Rhode Island pursuant to 28 U.S.C. 1404(a). 
CPC then filed a motion for a declaration that the substantive
law of New Jersey still governed the litigation. The motion
was allowed on the basis that a New Jersey court would apply
New Jersey law to the case because New Jersey was the state
which connected all the parties together and so had the most
significant interest in the outcome of the case. See CPC
Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 739 F.
Supp. 710, 715 (D.R.I. 1990). 
Applying New Jersey law, the district court allowed
Northbrook's motion for summary judgment on the ground that the
pollution exclusion clause in the policy precluded coverage for
gradual pollution. See CPC Int'l, Inc. v. Northbrook Excess
& Surplus Ins. Co., 759 F. Supp. 966 (D.R.I. 1991). The
district court predicted that the New Jersey Supreme Court,
which had not ruled on the issue, would define the term "sudden
and accidental" as referring to events which are unexpected and
unintended and which occur abruptly or over a short period of
time. See id. at 973. The court ruled that CPC had not shown
that the contamination was within this definition.
On appeal, this court reversed and remanded, saying
the district court's prediction gave insufficient weight to the
decisions of the New Jersey Superior Court's Appellate Division
(New Jersey's intermediate appellate court), which had
concluded that the term "sudden and accidental" was ambiguous
and had to be interpreted favorably to insureds as providing
coverage for gradual pollution. This court concluded that the
New Jersey Supreme Court would more likely construe "sudden and
accidental" to mean only unintended and unexpected, i.e., not
requiring the event to be abrupt or immediate. See CPC Int'l,
Inc. v. Northbrook Excess & Surplus Ins. Co., 962 F.2d 77, 97
(1st Cir. 1992). 
B. Round Two: Application of Rhode Island Law and First Trial
On remand, Northbrook moved for reconsideration of
the initial choice-of-law ruling in light of an intervening
change in New Jersey choice-of-law rules. That motion was
granted on the basis that New Jersey law now dictated that the
substantive law of Rhode Island governed the case. See CPC
Int'l, Inc. v. Northbrook, 839 F. Supp. 124 (D.R.I. 1993). 
This court denied CPC's petition for mandamus.
The case went to a jury trial on January 28, 1994. 
At the close of CPC's evidence, Northbrook moved for judgment
as a matter of law under Fed. R. Civ. P. 50(a). On February
16, 1994, the district court granted Northbrook's motion,
saying that CPC had failed to present evidence from which a
reasonable juror could conclude that there had been an
"occurrence" during the 1979-80 policy period, because the perc
spill took place in 1974 and there was no evidence that the
contamination reached the aquifer during the policy period.
C. The Second Appeal: The Trigger of Coverage Question Under
Rhode Island Law
On appeal, this court affirmed the application of
Rhode Island law, but concluded that Rhode Island law was
unclear on the trigger of coverage and certified this question
to the Rhode Island Supreme Court:
What trigger-of-coverage standard would the
Rhode Island Supreme Court use for
determining at what point an "occurrence"
causing "property damage" took place,
within the meaning of the insurance policy
provisions provided in the separate opinion
in this case, where an insured alleges that
a spill of hazardous contaminants in 1974
migrated through the groundwater, causing
immediate injury to the pertinent property,
which was not, in fact, discovered,
however, until at least 1979.

CPC Int'l, Inc. v. Northbrook, 46 F.3d 1211, 1222 (1st Cir.
1995). The Rhode Island Supreme Court answered: 
[A]n "occurrence" under a general liability
policy takes place when property damage,
which includes property loss, manifests
itself or is discovered or in the exercise
of reasonable diligence, is discoverable.

CPC Int'l, Inc. v. Northbrook, 668 A.2d 647, 650 (R.I. 1995). 
In light of that answer, this court vacated the judgment in
Northbrook's favor and remanded the case for a new trial. The
second trial was conducted in June of 1997 and resulted in the
verdict for CPC. CPC was awarded $12,632,885.94 in damages
plus prejudgment interest in the amount of $5,333,283. In
addition, Northbrook was obligated to reimburse CPC for all
costs incurred by CPC in remediating the Peterson/Puritan site
after February 28, 1997. After the jury verdict, the court
denied Northbrook's motions for judgment as a matter of law
under Fed. R. Civ. P. 50 and for a new trial under Fed. R. Civ.
P. 59. It is from this jury verdict that this appeal is taken.
IV
Discussion
We discuss the pertinent evidence in light of the
particular claims on appeal. The facts are stated as the jury
and district court could have found them. See Cambridge
Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 756 (1st Cir.
1996). 
A. The Discoverability of Property Damage
Northbrook's central argument on appeal is that its
motion for judgment as a matter of law was improperly denied,
because the evidence compels the conclusion that CPC knew or
reasonably should have known of property damage before July 1979.
Appellate review of the grant or denial of a motion
for judgment under Fed. R. Civ. P. 50 is de novo, applying the
same standard that governed the adjudication of the motion in
the district court. See Costos v. Coconut Island Corp., 137
F.3d 46, 48 (1st Cir. 1998). All of the evidence is examined
in the light most favorable to the nonmoving party, drawing all
possible inferences in its favor. See Cambridge Plating Co.,
85 F.3d at 764. We do not consider the credibility of
witnesses, resolve conflicts in testimony, or evaluate the
weight of the evidence. See Wagenmann v. Adams, 829 F.2d 196,
200 (1st Cir. 1987). We will reverse the denial of a Rule 50
motion "only if reasonable persons could not have reached the
conclusion that the jury embraced." Coconut Island Corp., 137
F.3d at 48 (citation and internal quotation marks omitted).
Here, the initial issue is whether there is
sufficient evidentiary support for the jury's conclusion that
there was an "occurrence" between July 1, 1979, and July 1,
1980. The terms of the policy are set forth earlier. The
definition of "occurrence" is given content by Rhode Island
law:
[A]n "occurrence" under a general liability
policy takes place when property damage,
which includes property loss, manifests
itself or is discovered or in the exercise
of reasonable diligence, is discoverable.

CPC Int'l, Inc., 668 A.2d at 650. Under this formulation, the
term "occurrence" and "property damage" are closely connected:
Read together, the provisions of the
Northbrook policy provide coverage to an
insured that sustains an occurrence -- that
is, an event that results in compensable
property damage during the policy period. 
In other words, there can be no occurrence
under the policy without property damage
that becomes apparent during the policy
period, and property loss and compensable
damages cannot be assessed unless the
property damage is discovered or manifests
itself. "Property damage" and "occurrence"
are thus inextricably intertwined.

Id. at 649.
Northbrook focuses its attack on the
"discoverability" prong of the Rhode Island definition of
"occurrence", saying that CPC should have known that its
routine waste-disposal and polluting activities and the 1974
perc spill would cause property damage long before 1979. 
Northbrook argues that the jury, while properly instructed on
Rhode Island law, misapplied that instruction. As to how the
jury applied the instruction, our knowledge is only that the
jury returned a general verdict in favor of CPC in the amount
of $12,632,885.94, and thus necessarily found that the property
damage did not manifest itself, and could not have reasonably
been discovered, before July 1979. Northbrook did not request
special verdicts.
B. Exclusion of Evidence
Before addressing the merits of the insurer's
argument on this sufficiency issue, we stop to consider
Northbrook's argument that it was erroneously prevented from
painting a fair and complete picture for the jury by the
exclusion of evidence. As with any argument addressed to the
exclusion of evidence, Northbrook faces the challenge of
meeting the abuse of discretion standard. See Rodriguez-
Hernandez v. Miranda-Velez, 132 F.3d 848, 855 (1st Cir. 1998)
(citation omitted). If Northbrook were correct that the
exclusion of evidence was an abuse of discretion and
prejudicial, we would not reach the issue of whether there was
adequate evidence to support the jury verdict. But while
Northbrook's argument is far from frivolous, our conclusion is
that the ruling was well within the court's discretion.
The major component of Northbrook's defense was that CPC
should have known about the property damage resulting from the perc
spill and other polluting activities well before 1979. Towards
that end, Northbrook put on state-of-the-art and state-of-knowledge
evidence as to CPC's knowledge before 1979 of the dangers of
release of VOC's and perc in an effort to show that CPC knew or
should have known that the chemicals would contaminate the ground
and groundwater. 
We take it as given that such evidence may generally be
helpful to the jury in determining what a party should have known
at some time in the past. Findings about what another operation of
the company knew and had been told about the danger of groundwater
contamination of a similar type can help the jury in determining
whether CPC exercised reasonable diligence with regard to this
particular spill. See Chemical Leaman Tank Lines, Inc. v. Aetna
Cas. and Sur. Co., 817 F. Supp. 1136, 1150 (D.N.J. 1993) (admitting
evidence of plaintiff insured's problems at other tank cleaning
sites on issue of company's knowledge). 
Such state-of-the-art and state-of-knowledge evidence is
used by both sides in many contexts in civil and criminal
environmental and toxic tort litigation. For example, it is used
by insurers and insureds in insurance coverage cases. See Mottolov. Fireman's Ins. Co., 43 F.3d 723, 730 (1st Cir. 1995) (discussing
the usual summary judgment burden shifting rules applied to this
area of law); Chemical Leaman Tank Lines. Inc., 817 F. Supp. at
1149-50 (use by insurer against insured); Hatco Corp. v. W.R. Grace
& Co., 801 F. Supp. 1334, 1376 (D.N.J. 1992)(insured submits state-
of-knowledge evidence to oppose insurer's contention that insured
intended and expected to cause contamination at site); New Castle
County v. Continental Cas. Co., 725 F. Supp. 800, 803-04 (D. Del.
1989) (state-of-the-art knowledge about leachate from landfills
apparently introduced by insured on issue of whether the pollution
was expected). It is also used in the allocation of responsibility
under the "Gore" factors in private party CERCLA contribution
actions. See Gould v. A&M Battery Tire Serv., 987 F. Supp. 353,
363-64 (M.D. Pa. 1997) (successor operator presents state-of-the-
art defense). Some state-of-the-art evidence was introduced here,
but specific evidence was excluded.
Here, Northbrook sought to introduce (1) judicial
decisions in two previous CPC coverage suits involving groundwater
contamination at CPC facilities in New Jersey and Michigan, see CPC
Int'l, Inc. v. Hartford Accident & Indemnity Co., Bergen No. L-
37236-89 (N.J. Super. April 15, 1996); CPC Int'l, Inc. v. Aerojet
Corp., 825 F. Supp. 795 (W.D. Mich. 1993); (2) trial testimony of
CPC's Senior Corporate Counsel and others as to whether certain
facts found in those opinions were correct; and (3) certain related
documents. There was no specific offer of proof as to what any of
the proposed witnesses would say; their depositions had not been
taken. Nor was this broad band of evidence narrowly tailored to
the precise issues involved at trial. 
Northbrook argued that such evidence would show that CPC
knew long before 1979 about the harmful effects of VOC groundwater
contamination. Northbrook wanted to introduce certain findings of
fact contained in the judicial decisions establishing that CPC was
cleaning up groundwater contamination in its facilities before the
1970's and that one state court had enjoined CPC from using lagoons
for waste disposal because of the contamination which resulted. 
CPC responded that circumstances at the Michigan and New Jersey
sites were very different from those at Peterson/Puritan, and that
the prejudicial and confusing effect of admitting the decisions
would far outweigh their probative value.
The New Jersey case was a coverage suit filed by CPC for
indemnification of environmental remediation costs incurred during
the clean-up of three facilities operated by a CPC subsidiary. All
three sites had VOC groundwater contamination from the use of
underground storage tanks and lagoons into which aqueous chemical
waste residues were deposited. The Michigan case was a
consolidated CERCLA action where numerous parties contested
liability for the cleanup of a dormant manufacturing facility which
had heavy soil, surface water, and groundwater contamination,
principally from the use of unlined lagoons as sites for chemical
waste disposal. 
After extensive voir dire, the district court excluded
the decisions on Fed. R. Evid. 403 grounds, saying first that their
introduction would require a "replay of the litigation of those two
cases," in that the parties would have to argue about the
similarity of the previous lawsuits to the instant case. This
would take "much time and considerable effort, and I think with
little result." The court also said that the opinions were not
relevant to whether CPC could have discovered property damage in
the exercise of reasonable diligence, because the facts underlying
the two opinions were different than the facts here; moreover,
neither opinion addressed the issue of "property damage" as defined
in the policy. The court concluded that introduction of the prior
decisions could prejudice the jury about CPC and its conduct in the
instant case.
We start with Northbrook's initial burden of showing that
the proffered evidence was relevant. On this, there is
considerable confusion. If the proffered evidence plainly showed
that the other sites involved similar chemicals and similar methods
of transport and contamination, we could easily find the evidence
relevant. But the record is confused and confusing. It appears
that the other sites involved largely chemicals which were not
VOC's at all and included phenols and chlorides. It also appears
that the sites did not involve a massive quickly-happening and
quickly disappearing flood of a chemical, such as the 1974 perc
spill, but slow seepage and spillage from constantly filled waste
lagoons.
But recognizing that knowledge is often gained from
analogous events as well as from identical events, we will assume
the evidence was at least somewhat relevant. Under Rule 403, the
district judge was then required to determine whether "its
probative value [was] substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or misleading the jury,
or by considerations of undue delay, waste of time, or needless
presentation of cumulative evidence."
The dangers of unfair prejudice were certainly real, as
the trial judge recognized. "Unfair prejudice," as the Advisory
Committee Note teaches, means an "undue tendency to suggest
decisions on an improper basis, commonly, though not necessarily,
an emotional one." Northbrook sought to introduce evidence in the
form of judicial decisions that two other courts had made findings
that other CPC operations had contaminated groundwater. Citizens
do not look fondly on industrial polluters, particularly when the
industries have been found to be such by a court. There was a
danger such evidence would lead to a decision based on emotion or
a desire to punish. We have said exclusions under Rule 403 were
appropriate where such dangers are strong. See United States v.Aguilar-Arancita, 58 F.3d 796, 800-802 (1st Cir. 1995); LaPlante
v. American Honda Motor Co., 27 F.3d 731, 739-40 (1st Cir. 1994);
cf. Nickerson v. G.D. Searle & Co., 900 F.2d 412, 418 (1st Cir.
1990) (affirming exclusion of questions of medical expert on his
work in abortion clinics because of danger of an emotional
reaction).
By focusing on judicial findings, Northbrook ran into
other difficulties, ones this court described in Kinan v. City of
Brockton, 876 F.2d 1029 (1st Cir. 1989). In Kinan, the plaintiff
sought to introduce evidence of two previous civil rights actions
filed against the same police officer whose conduct was the subject
of the instant suit; the plaintiff sought to introduce those
previous decisions as proof that the defendant had a custom or
policy of depriving its citizens of certain constitutional rights. 
See id. at 1033. The district court excluded the evidence. Seeid. Kinan affirmed the exclusion on the basis that the evidence,
even if relevant, would result in jury confusion, wasted time, and
be unfairly prejudicial. See id. at 1034-35. Kinan based its
reasoning in part on the fact that the proffered cases had settled
prior to trial and were decided on the basis of negotiation, not
adjudicated findings of fact. See id. While Kinan is far from
controlling, the dangers warned against in Kinan are real: 
[I]ntroducing evidence of the two other cases
would inevitably result in trying those cases,
or at least portions of them, before the jury. 
The merits of the two other cases would become
inextricably intertwined with the case at bar. 
The result would be confusion and consumption
of a great deal of unnecessary time. 

Id. at 1034. These concerns were echoed by the district court in
excluding Northbrook's proffered evidence.
Weighed against this is the seemingly weak probative
value of the evidence. In order to strengthen that probative
value, Northbrook would have had to introduce evidence perfecting
the analogy of the other sites and chemicals to the ones at issue
in this trial. That, in turn, would have led, as the district
court aptly noted, "to a replay of the litigation of those other
two cases." And that, in turn, could have mislead the jury and
certainly would have caused delay. The call made by the
experienced trial judge, who had the look and feel of the trial
before him, was eminently reasonable and not an abuse of
discretion.
C. Sufficiency of Evidence on Discoverability
We return to the picture as it was painted for the jury. 
CPC and Northbrook presented two conflicting views of what CPC
actually knew and what CPC should reasonably have known about
pollution around the plant and the effect of the perc spill. Here,
a jury rejected Northbrook's claim that the state-of-knowledge
about the dangers of VOC's was such prior to 1979 that CPC was on
notice about the dangers of groundwater contamination. 
On appeal, Northbrook constructs its argument -- that CPC
knew or reasonably should have known of that damage before 1979 --
out of these major elements:
1. CPC had actual knowledge of the perc spill in 1974.
2. CPC should have known that the perc from the spill
would enter the groundwater within a few days.
3. CPC knew in 1974 that perc was a hazardous substance
from the Chemical Safety Data Sheets ("CSDS"), which stated that
"[i]f swallowed, perchlorethylene liquid has toxic effects."
4. In 1972, the Manufacturing Chemists Association, the
distributors of the CSDS for perc, distributed a manual entitled
"Guidelines For Chemical Plants in Prevention, Control, and
Reporting of Spills," which warned:
2.1.6 Pollution of Ground Waters

While many spills result in detrimental
effects on sewage treatment systems of surface
water, some can affect the quality of ground
waters. Leaks from storage tanks . . . can
percolate downward or laterally into shallow
waters.
...
The geology of the area is an influencing
factor in determining the migration of spills
of this type. Sandy soils are particularly
subject to percolation of pollutants into
ground waters

This statement did not, however, refer specifically to perc.
CPC opposed Northbrook's account with evidence that there
was little reason before 1979 to think that a perc spill, or even
historic releases of VOC's into manholes or catch basins at the
plant, would descend into the aquifer, move laterally into the
wellfields, and cause property damage. CPC put on expert testimony
that the dangers known to be associated with exposure to perc in
1979 were of skin contact, inhalation, and possible asphyxiation. 
CPC's experts said that these were the primary dangers that were
known concerning VOC's.
As to the pre-1979 state-of-knowledge about responding to
a perc spill, CPC's evidence was that the earliest literature on
that particular chemical was information in 1978 from the National
Firemen's Protection Association. That information was that such
spills should be washed down with a fire hose. Those who actually
dealt with the 1974 perc spill at the Peterson/Puritan facility
testified that the company followed the directions of the Rhode
Island Department of Environmental Management and washed down the
spill and then covered it over with soil or gravel. The primary
risk people were then concerned with was that of fire. Witnesses
testified that there was little or no contemporary awareness about
the risk and effect of groundwater contamination. Indeed, even as
of 1979, there were no state or federal standards for impermissible
levels of perc in drinking water.
We conclude that the jury could reasonably find, as it
implicitly did, that the earliest discovered or discoverable
property damage was the contamination of the Quinnville Wellfield
which caused it to be closed in 1979. The evidence did not compel
a finding in Northbrook's favor.
D. The Pollution Exclusion and the Sudden and Accidental Exception
Having rejected Northbrook's challenge to the jury's
finding that there was an occurrence within the policy period, we
turn to its related argument that the property damage resulted from
activities within the policy's pollution exclusion, i.e., that CPC
did not meet its burden of proving any "occurrence" was caused by
a "sudden and accidental" discharge.
Northbrook does not dispute that the 1974 perc spill was
sudden and accidental as that term is defined by Rhode Island law. 
Rather, its argument is that the perc spill is beside the point
because the property damage for which the indemnification is sought
is from all of the pollution at the Peterson/Puritan site, and this
pollution is largely the result of the regular and routine
polluting activities which took place at the plant over many years. 
This pollution included washing waste-water containing chemicals
down various sinks and drains at the plant which discharged into
the septic system and leaching fields. It also includes minor
leaks and spills that occasionally took place at the chemical tank
farm, where the spilled chemicals would travel directly through a
gravel floor into the ground. Northbrook contends that these
activities were not sudden and accidental, and thus are not covered
under the pollution exclusion. The existence of a single sudden
and accidental event, Northbrook says, such as the 1974 perc spill,
does not mean that CPC may avoid the consequences of its on-going
contamination.
Northbrook's argument falters on the fact that the jury
accepted an alternative view of the evidence which has adequate
support in the record. This alternate view is that the
indemnification is sought for clean-up costs mandated by the EPA
for OU-1 in its efforts to protect and restore the Quinnville
Wellfield, that the perc spill caused the damage to the wellfield,
and that remediating the contamination from the perc spill is the
principal source of the costs -- including, as explained below,
costs for remediating contamination which originated from routine
activities at the plant.
Evidence upon which the jury could rely included the ROD,
which stated that the wells had not been contaminated before 1979
and that, but for the contamination, the wells could be reopened. 
Referring to the perc spill, the ROD stated that "this spill, along
with historical releases into manholes and catch basins, . . . is
the primary source of contamination." (Emphasis added). The ROD
described the wellfield as "a receptor of OU-1 contamination" and
said that "the potential future use of the wellfield as a drinking
water source is a realistic possibility." The ROD thus required
CPC to clean-up the OU-1 area to drinking water standards -- a
significant point which emphasizes the EPA's focus on restoring the
wellfield to use, not merely cleaning the soil (although one is
prerequisite to the other). 
The jury could also credit evidence that in the period
before the perc spill such contamination as existed at the plant
was trapped in the soil and did not migrate into the groundwater,
and that the perc spill was the vehicle which brought the
contaminants into the groundwater. On this point, there was expert
testimony that the perc spill was responsible: some of the perc
volatized, forming a large, spreading vapor cloud which moved
through the soil slowly, dissolving contaminants in its path,
carrying those contaminants along with it as it descended into the
groundwater. 
It is true, as Northbrook argues, that under the 1995
Consent Decree, CPC must carry out the remedy in the ROD including: 
(1) the excavation of contaminated soil in manholes and catch
basins at the facility; (2) the capping of soil in the tank farm
and paving of soil in the O'Toole property; and (3) the
implementation of a soil venting and soil vapor extraction system. 
But the jury apparently believed, on the evidence, that these costs
were necessitated by the clean-up of the aquifer so that the wells
could be restored, and that it was primarily the perc spill which
necessitated that clean-up. 
The evidence does not compel a finding in Northbrook's
favor on this point. The jury could reasonably have found that
contaminants released at the plant would not have caused any
property damage absent the perc spill, and that the perc spill was
therefore the real and ultimate cause of the environmental damage
to the wells. And the jury could reasonably find that the costs
incurred by CPC during the EPA-ordered clean-up are for remediating
pollution so that use of the Quinnville Wellfield might resume. 
In sum, Northbrook's challenge fails. The issues here
were for the jury to decide and there was sufficient evidence to
support the verdict. See New Castle County v. Hartford Accident
and Indem. Co., 933 F.2d 1162, 1192 (3d Cir. 1991).
E. Microanalysis
The parties and the amicus have argued in their appellate
briefs about "microanalysis." Northbrook suggests two different
concepts under the label of "microanalysis." The first is that
where there is a history of a pollution-prone operation, it is
wrong to analyze each single polluting event to determine whether
it was "unexpected," and thus perhaps subject to characterization
as "sudden and accidental." See, e.g., Lumbermens Mut. Cas. Co. v.
Belleville Indus., Inc., 938 F.2d 1423, 1427-30 (1st Cir. 1991)
(rejecting such an approach). Amicus joins this argument, echoing
this court in arguing that such an approach would "eviscerate the
exclusion for pollution." Id. at 1428. Various courts have
characterized the so-called "microanalysis" approach as attempting
to "break down [regular polluting activities] into temporal
components in order to find coverage where the evidence
unequivocally demonstrates that the pollution was gradual," Smithv. Hughes Aircraft, 22 F.3d 1432, 1438 (9th Cir. 1993) (internal
quotation marks omitted); see American States Ins. Co. v.
Sacramento Plating, Inc., 861 F. Supp. 964, 971 (E.D. Cal. 1994),
or as "an ill-fated effort to distinguish between virtually
indistinguishable occurrences." Lumbermans Mut. Cas. Co., 938 F.2d
at 1428; see also Charter Oil Co. v. American Employers' Ins. Co.,
69 F.3d 1160, 1170 (D.C. Cir. 1995) (describing approach as attempt
to "disaggregate" "an activity occurring over an extended period"). 
The facts of this case do not invoke any of those perils. This is
not an instance of attempting to parse a sequence of events in
regular polluting activities into component parts and then arguing
whether each part is sudden and accidental. Rather, there was a
massive, sudden and accidental event in the perc spill and it was
up to the jury to decide whether that, or the ongoing pollution,
led to the property damage for which indemnification is sought. 
The short answer to Northbrook's first "microanalysis" argument is
then that this case does not raise that issue at all.
The second concept Northbrook raises under the label of
"microanalysis" is whether damages for sudden and accidental
releases may be parsed out from damages caused by routine, regular
pollution within the exclusion. Massachusetts law, for example,
allows for this possibility where the damage from sudden and
accidental releases are identifiable and are themselves appreciable
(or not de minimis) and compensable. See Highland Ins. Co. v.
Aerovox, Inc., 676 N.E.2d 801, 806, 424 Mass. 226, 234 (1997);
Nashua Corp. v. First State Ins. Co., 648 N.E.2d 1272, 1275-76, 420
Mass. 196, 202-203 (1995); see also Millipore Corp. v. Travelers
Indem. Co., 115 F.3d 21, 34 (1st Cir. 1997). In those cases it was
in the interest of the insured companies to try to identify and
carve out a portion of the damages as being attributable to sudden
and accidental events (for which there was coverage) when the
general damage suffered was attributable to regular polluting
activities which were subject to the pollution exclusion (for which
there was no coverage). But the doctrine is a two-way street:
here, it may have been in the insurer's interest to carve out a
portion of CPC's claim as attributable to regular pollution
activities (and thus not coverable) against a backdrop of an
overall damages landscape a jury could have viewed as shaped by one
sudden and accidental event. But, as a matter of trial tactics,
the insurer chose not to raise the issue, and it is waived. We
thus have no occasion to predict whether Rhode Island law, which
governs this case, will adopt a rule similar to the Massachusetts
rule.
The decision of the district court is affirmed.